Good morning members of the court. Unless the court has a different preference, I would like to focus on the merits of the jury instruction issue. In terms of whether there was an instructional error, I really have relatively little to add to the brief. I was going to reiterate that the instructions given in this case were the same as the ones that were given in Hull v. Carey. My position is that both cases are materially indistinguishable. In this case, the judge did specifically say malice was an element of the second-degree murder charge, did he not? Yes, Your Honor, I believe so. Was that said that there was such an itemization of elements in Hull? Well, although Hull is not clear as to the wording of the implied malice instruction, Hull is clear that the correct definition of implied malice instruction had been given at some point. The pinpoint side in the Hull opinion is 593 and 594 in the majority opinion, and 597 in the dissent. So they're not clear as to the timing, but they were clear that the correct instruction on implied malice had been given in Hull. The only possible difference from what I could see was that here the instruction was after mentioning the need for another mental state, a specific intent mental state, before saying implied malice, it said unless such mental state exists, the crime to which it relates is not committed. And I don't think there were, at least there was no indication in the report in Hull that that specifically notion, which precluded any, or arguably precluded any misunderstanding that the general intent instruction was an alternative, was given in Hull. We can't really tell that. Is that right? Well, we can't really tell, you know, there's no, the opinion in Hull doesn't list the precise language of the instruction. Or that language in particular, or any language in particular that tells the jury how to put the two together. But if I could go back for a second, Your Honor, could you please repeat what you just said, because I apologize, I missed it. In terms of, you said there was one. Unless such mental state exists, the crime to which it relates is not committed. That instruction was given here with regard to the need for a certain mental state in the crime charge in count one. And then in the very next sentences, in the crime of murder in the second degree, the necessary mental state is implied malice. So they seem to have been told quite specifically that you absolutely have to have implied malice. Right, but they also have been quite specifically told that it's a general intent crime, whereas the commission of the act. Well, in fact, don't you also need general intent? I mean, you need to have an act intentionally done, and you need to have the reckless disregard. So what's wrong with that? Well, because if you give an instruction which says that the intent element is met by the commission of the act. Where does it say that? That's the question. It doesn't say that. OK, here is it. I'm sorry. I'm going to read from the pertinent language, pertinent portion of it. To constitute general criminal intent, it is not necessary that there should be an intent to violate the law. When the person intentionally does that which the law declares to be a crime, he's acting with general criminal intent. Even though he may not know that he's acting. Right. And all of that is perfectly consistent with the requirements of implied malice, right? And to have implied malice, you still don't have to know that what you did is unlawful. Well, I guess I respectfully disagree. I think that instruction basically tells you that if an act is committed, the prescribed act is committed, then the intent element is met. I think this Court has held so in Ho. It doesn't say that, though. It just says that that's something you have to show. And then it later says, in addition, in the second-degree murder, you have to show malice. Right. But then when it says that, and I guess the Court will ultimately do what it will do, but my reading of the instruction is that it states that Well, it seems to me your strongest argument is Ho, because Ho doesn't seem to be concerned about this. I mean, Ho went on about the general criminal intent and sort of mentions in passing towards the end that there was also an implied malice instruction. I would agree with that. And doesn't seem to care about it. But to me, looking at this piece, at least these pieces of paper, I don't know what was confusing about it. Well, and I guess different people will read different things from an instruction. The way I read it, I thought that it tells them that the intent element is met if And you don't have to have an intent to violate the law, and that's true. You don't. Right. Including under second-degree murder. Right. But it also tells them that an act is enough to establish intent. And using that instruction, the prosecutor was able to argue for prolonged periods of time that the jury didn't need to decide my client's defense because, you know, he didn't act. He drove. And did he argue that? I'm sorry? Did he argue that? Well, no. He argued that he, you know, that that was my client's defense. The defense was he didn't act with implied malice. All right. And did the government argue that that wasn't a defense? Well, yeah. Pages 760 and 61 in Volume 7 of VII EIR. Pages 714 to 721, Volume 7 of the EIR. That was the prosecutor's position. In fact, on page 760, the prosecutor states, you do not have to decide my client's defense. What happened in terms of why Mr. McKeever drove out of the parking lot, it's irrelevant. And I think that dovetails into what the instruction told him. You know, obviously, the argument of counsel is not sufficient to cure an incorrect instruction. But in this case, the prosecutor, I believe, was taking full advantage of the fact that the instruction was worded the way it did. Didn't the prosecutor say, though, that an office was required? I'm sorry? Didn't the prosecutor say in his argument that malice was required? She did. But she structured it in the way that went back to her argument that because she drove, that covered everything. And that his defense was relevant. In fact, I believe that's the language that was used on page 760. And we also discussed that in the brief. And to go back for a moment, I do agree with Judge Brezon that it is my, obviously, my strongest argument that this Court has already decided that this particular instruction is erroneous as a matter of law. Not even under the reasonable ethical standard, it's flatly erroneous. It has remained the law. California hasn't changed its law in any way to do anything to undermine the validity of folks. If it is constitutional error, how was it not harmless? Well, the applicable standard is whether there is substantial injurious effect on the verdict. And in the context of a jury instruction error, the Court would look to see whether there was evidence from which the properly instructed jury would have, could have found that he didn't act, my client didn't act, it was implied malice. And in this case, I believe there was ample evidence from which they could have done so. Aside from my client's testimony, there was physical evidence in the form of the cuts on his face and on the victim's face, which were consistent with him being punched, and which was consistent with what he told the jury that, you know, he got attacked, Mr. Fermata got attacked, they were punched, you know, then the attack stopped, and then somebody came up to the window, grabbed the window seal, and he panicked, and he stepped on the gas. Was there any motive introduced at all as to why he would want to run over his friend? No. To answer your question, no. By all accounts, there was an amicable chat throughout the meeting. They met at a different bar. These people didn't actually know each other before all this? Either they didn't know each other completely or they knew each other very, very, very passingly. And there was some testimony I thought that they were having an argument at the end. There may have been one witness who said that. There were a lot of witnesses who said something else. More importantly, the prosecutor told the jury that this is not a case where you have to decide that somebody is lying. She actually told the jury that you don't have to decide that. She actually took a position that what my client was telling them was true in terms of the mechanics of how it happened. The prosecutor's position was that it was irrelevant because he drove. As long as he knew the guy was in front of the car? Well, I don't believe she actually said that. Was there a dispute about whether he knew that the guy was in front of the car? Well, yeah, because my client definitely testified that he did know, and Chris Conley, who I would label sort of the prosecution's star witness because their case went along his narrative, he said he didn't think that my client knew that the guy was under his car because that's why he went to warn him. Well, but then he knew it. Well, he said that he did know. But it's my point is that Mr. Conley's testimony corroborates my client's testimony, at least to the effect that he initially didn't know, and then somebody came up to his window and he saw there was a continuation of the attack. It was a dark parking lot. It was 2 o'clock in the morning. At least one witness said that there were no street lights, so the most you have I think there was testimony that the headlights on the van may have been on, but it was a light-colored model van. Unfortunately, we don't know what precise make and model of the van it was, but if it's an older van, chances are it has a relatively raised hood, so it's certainly not implausible that he didn't see him. Weren't there other eyewitnesses, one who changed her testimony? Right. Ms. King actually changed her testimony and said that, well, she told the defense investigator that, in fact, there was a fight in the parking lot that preceded the accident, and it actually involved Corinne Slonsford, who was one of the people's witnesses. So her statement to the defense investigator would corroborate my client's defense, and even her trial testimony, Ms. King didn't really take that back. She said that she wasn't sure what she said. She did admit that she read the statement. Also, I think Janine Brown, the bartender at Taylor's, has said that there may have been some kind of a fight in the parking lot. Obviously, she was inside, so she saw the van, and she saw my client and Mr. Formatter talking shortly before the accident happened. But there was definitely testimony from which the jury could have found that he didn't know, and my client definitely disputed that. That he did not know. He did not know that the victim was in front of the van. Were you allowed to put on an intoxication defense? I do not believe that there was ever a request to put on involuntary intoxication defense. In fact, I don't believe that was my client's defense. The defense was either this was an accident, or that if it wasn't an accident, that at least it wasn't implied malice, because my client did not know that the victim was in front of his van. There was never a request.  So his position wasn't that even if he knew he was in front of the van, he was still not in reckless disregard because of his mental state being, something like a sort of imperfect self-defense sort of defense? Well, I don't believe he ever said that it was irrelevant whether he knew or not. In fact, I think his defense was that he didn't know. I don't believe the defense argument was that it was irrelevant. Obviously, if you know that a person is... But then why doesn't that get to the harmlessness, back to the harmlessness problem, in the sense that the jury had to have found that he knew in order to find what it found? Well, and I guess I would respectfully disagree because going back to the instruction, I think that they may have felt compelled to find that it was murder, even if they didn't think that he knew because the instruction told them that the act is an act. As long as he drove the car, that was sufficient? Well, right. And the prosecutor kept pounding and saying that it was sufficient that he drove the car. It doesn't really matter what prompted him to... Prompted him is one thing, but whether he drove the car, knowing the guy was in front of the car or not is a different story. In other words, there are two different elements here. One of them is why did he drive the car? Did he do so because he was drunk? Did he do so because he was so upset that he... because he'd been punched that he just acted reflexively and didn't think about whether somebody was there? Or did he do it knowing somebody was there but disregarding it? But that's one strain. But the other strain is whether he knew the guy was there. And if he didn't know the guy was... the jury necessarily had to have found that he knew the guy was there. Well, again, I would... my position is that the instruction didn't tell him that it was relevant and the prosecutor told him it was irrelevant and we do not know in what order... in what order he was convicted of murder on the ground that he drove a car and somebody was run over. Based on the instruction that they were given, yes. Because they were told that they had to follow the instructions that the court had given them. They were not permitted to question them. I mean, that's the same situation that was in Hope. The court was quite specific in Hope. The jurors were not... Well, what would they have done with the fact that they were specifically told that there had to be implied malice and it had to have... and that had to mean that there was reckless disregard with regard to the impact on human life? What, they just would throw that out the window? Well, Your Honor, they are not... at least we have a situation where the case was submitted to the jury at least on one alternative theory which wasn't constitutional. And I see that my time has run out. But if Your Honor wants me to continue, I will. No, that's fine. Thank you. Thank you. May it please the Court. Deputy Attorney General Christine Bergman on behalf of Apelli. I'd first like to briefly address the first issue, whether the district court properly exercises discretion. And here on remand, the district court did exactly what this court wanted to do. It specifically addressed the objection and then it stated... It addressed it on the assumption that he had never raised an issue other than the Engelhoff issue. I believe if you read the order declining to reinstate it, in essence it did address it. It did address Engelhoff, but it also addressed why Ho wouldn't control. And essentially here what the district court did... That was a substantive determination. But as to the question of... So then the merits and the abuse of discretion merge into each other because if we think that Ho would matter here, then there was an abuse of discretion. They do really kind of merge into each other. Therefore, it's not worth talking about. So really, let's just go on. Which is why we didn't go into it with the counsel. In addressing Ho, Ho is not controlling here because we did have that additional instruction. Almost immediately after the instruction on general intent, the district court told... I mean, I'm sorry, the trial court told the jury, General intent is not enough for second-degree murder. You need to find this necessary mental element of implied malice. Well, in Ho, though, we know that they were instructed on implied malice. I understand it was somewhat downplayed in the majority opinion, but it was definitely there. In Ho, we don't know that what was here was Calgic 3.31.5, where it said that the necessary mental state was implied malice. Ho never addressed that that instruction was given. Here, what that instruction did was it told the jury... They defined general intent, but then it said, But for implied malice murder, you need this necessary mental element of implied malice. And then later, when it went through what the elements for second-degree implied malice murder were, they told the jury they had to find that the act was deliberately performed with the knowledge of the danger to and conscious disregard for the life of another. So here, unlike in Ho, here it was all linked together. So the jury wouldn't have just thought, Oh, general intent, that's enough. You know, he presses on the gas pedal, that's enough. Here, the jury was told they need to have more. And the prosecutor did not just argue that driving over the victim was enough. The prosecutor, in argument, tied together the definition of implied malice. He said that an appellant had to perform an act knowing his conduct was dangerous to others and that he had to have the subjective awareness, and that's what implied malice is. So we have more here than what was present in Ho. And so this case is definitely different than Ho. So just to back up a minute on what you just said, your position is that on the prosecution's theory of the case, he at least had to know that the victim was there. Is that what you're saying? Under the prosecution's theory of the case, he had implied malice because he had admittedly three prior driving under influence convictions. He had attended a year-long of alcohol awareness classes that focused on the dangers of drinking and driving. He drove to a bar. He drank, the defendant admitted it, the one bar he had, about eight to ten beers. He went to two bars, drove to two bars. Okay, but what if his defense was that he didn't know the victim was in front of the car? On the prosecutor's theory, could he have been convicted anyway? They still could have found implied malice based on the fact that he acted for conscious disregard for life by the fact that he knew the dangers of drinking and driving. He drank several drinks, got in that car, and drove. And hit somebody, just anybody? Well, you have to tie them together. In fact, he ran over someone, but he admitted he ran over someone. I understand, but he didn't admit. He thought, according to his story, he didn't know that someone he ran over was under the car when he took off from the fight scene. I believe his story was that he knew he ran over him, but he ran over him because he just pressed the gas pedal in a panic was his story. No, his story was that he didn't know he was under the front of the car. He couldn't even see him because he was in front of the car on the ground. I don't recall him testifying to that. And I know there was an eyewitness who testified. They said, hey, you knocked your buddy down. Right, and you need to believe that or not believe that. So that's why I'm, I mean, ultimately, in terms of looking at the homelessness question here, if there was a problem under how, the question is, did the jury necessarily find that he knew that this man was in front of his car? And you're saying no. No, I'm saying the jury did find. Why? In your theory of the case, you didn't have to know that. Yeah, in your theory of the case, the analyst was just driving happy. Please don't talk over me. I am asking you a question. Under your theory of the case, isn't it that he, his, the implied malice was his having had a problem with drinking and his driving the car after having a many number of drinks that night? For the, yes, for the implied malice. Whether he knew there was somebody in front of the car or not.  They might have under a different element, but under the element of implied malice, they would have just had you find that he performed a deliberate act with the conscious disregard of the danger to others. Here, the fact of getting in the car and driving while intoxicated with the knowledge that that is dangerous to others, based on his prior DUIs and the alcohol education classes he went to, that is enough for the implied malice. But here there was evidence that he knew that the victim was in front of his car. And that's supported by the fact that when he left the parking lot, he went and called 911 and said that somebody was ran over. And then when the police came and arrested him the next morning. He might have realized it afterwards. I mean, the jury could easily have found that he didn't, in your theory, that he was drunk, therefore he's guilty, and that he didn't know when he pressed the gas pedal that the victim was under his car. But he realized it later. You know, as he went over a body. I think here, based on all the evidence, the reasonable inference is the jury found that he knew the victim was there. They were all standing, the victim and some others were standing around the van like the appellant was in the van warming it up. The one eyewitness, you know, as we discussed, testified that as he was warming up the van, he bumped into the victim. So how ultimately do you distinguish Ho? Ho's ultimately distinguished because here they implied, they instructed that general intent applied to three crimes, including the second-degree murder. After that it. Well, all right. So in Ho, although it's downplayed in the majority opinion, the jury at one point in the course of the jury instructions, the trial court properly defined applying malice. But because it never corrected its erroneous general intent instruction, which it didn't here, the court's instructions also permitted the jury to find that Ho was guilty of second-degree murder even if it found the evidence merely showed general intent. And there is a dissent. And the dissent says, well, he didn't see how that could be. And goes with Judge Ho. And he says that, in fact, there was a, the jury was correctly instructed on the elements of second-degree murder in the section of the instructions as to find all possible offenses that could be found. So that's where the jury would look to see which offense is applicable. And what's the problem, he says, and the majority have found otherwise. So I don't see, except for that one sentence I read before, and we don't know whether that was in Ho, I don't know what the difference is. But the difference is the additional instruction, which 3.31.5, that nothing in Ho, either in the majority or the dissent, says that that was given that told the jury in the crime of murder in the second degree, the necessary mental state is implied malice. The jury was correctly instructed on the elements of second-degree murder, says the dissent. In the section of the instructions as to find all possible offenses that could be found. And here the jury was, too, later on in 8.31. We have that additional instruction here that wasn't present in Ho, the 3.31.5. Which is the one that says, which doesn't contain any description of what implied malice is, but just says you need it. It says the mental state required is included in the definition of the crime set forth elsewhere in these instructions. So it linked it together. It told the jury to look for that. And then when they instructed on the elements of implied malice murder, they defined what implied malice was. And that it had to be the act was deliberately performed with the knowledge of the danger to unconscious disregard. I have not done this. But suppose we went, I don't know whether you've done it, but suppose we went back to the briefs in Ho and found out that that same instruction was given. Then our position is Ho was wrongly decided. What can we do about that? Unfortunately, if he found out Ho was right on point, then, and if he found it was error, then it was harmless here. Because of all the evidence that was presented of implied malice, as I stated before, the fact that he knowingly drove while intoxicated, once he, you know, with the background he had, knowing the dangers of drinking and driving, that was enough for them to find implied malice and the fact that the evidence did show he was aware that there was someone in front of the van, he ran over him, he drove out of the parking lot in excessive speed. We actually have another victim who was standing by his car who jumped out of the way because he thought the appellant was going to run him over. You put all that together and there is enough evidence that even if giving the general intent instruction was an error, it was definitely harmless here. So on the government's theory of the case, the dispute about whether these other people threatened him and the dispute about whether or not somebody said to him, was somebody under your car and all of that wouldn't make any difference? His story about that, I mean, it could have been he was so intoxicated, that's why he drove off in a panic. So no, that really wouldn't make a difference. So the defense was presented to the jury and they rejected it. Well, they didn't necessarily reject it because on your theory of the case, it wouldn't have mattered, even assuming the instructions were right. On your theory of the case, that's my point. On your theory of the case, none of that, of the implied malice theory, none of that mattered. So they didn't have to reject it. They could have believed it and still found it. They could have believed it and still found implied malice. Correct. I'm interested in your comment that if we went back and looked at the briefs and Ho and saw that the same instruction was given, that then we'd have to overrule Ho or disregard Ho in some way. Can we consider something that's not a fact that's set forth in the opinion? I don't believe so. I don't believe you can. So the answer is it doesn't make any difference, is it? That's correct, Your Honor. Thank you. I don't know if I'm saying it right. I'm just asking you. I don't think that's correct. We do that all the time when we're seeking to understand, say, for example, Supreme Court decisions. We look at the underlying cases and the underlying briefs and the underlying record so that we can understand what the Supreme Court was really saying. It's a similar situation. Okay. I apologize. It's all right. No need to apologize. I mean, you know, the question is, does Ho control this case? Correct. And based on the opinion, based on the language of the opinion, it doesn't. Well, it's ambiguous because it does say that there was an instruction given about second-degree murder and implied malice. It just doesn't spell out the words of it. And you're saying, I mean, you're sort of talking inside baseball. The Supreme Court is not speaking in a baseball language about Calgic this versus Calgic that, but that's not the language of this opinion and we can't tell. But we know that something was given telling the jury that for purposes of second-degree murder they had to have implied malice. We read the opinion as saying that Ho, when they were referring to the elements of implied malice murder, it was the Calgic 8.31, which defines the elements of implied malice murder. How do you know that? If I could have a moment. I thought the dissent. I believe the dissent on page 598 goes through the instruction that was given, and it's the, I believe it's the 8.31 that defines the elements, which was given here, but the dissent doesn't mention that additional instruction of the necessary mental element being implied malice. Does anyone have any further questions?  Thank you, counsel. Okay. Do I have any time left? You don't, but I'll give you one minute briefly. I would just urge the court to go back to pages 717 to 720 of the district attorney's closing argument because I believe she was arguing that it is irrelevant whether my client knew that the victim was in front of him. Well, it sounds like she was arguing that today too, but they had to preface it. Yeah. I think that had been the interior of the case, and I think that is incorrect. Well, the interior of the case, as she described it, wasn't that general intent was enough, but that with regard to implied malice, he didn't need to know that there was somebody there. Well, the way that implied malice is being used, was being used by the prosecutor and, frankly, by counsel this morning is that it really is subsumed into general intent. Well, is that true? I mean, isn't my understanding is that you could be convicted of second-degree murder for driving down a highway at 100 degrees when there were a lot of cars and leaving all over the place and there was a crowd of people, right? Yes. See, you don't have to know there's somebody there that you're aiming at. Right, but I don't believe they were alleging any other sort of reckless conduct beyond the fact that he ran the guy over, and there was little or no evidence that he did anything reckless other than, you know, running over a person that was in front of his van. Certainly, it was a far cry from California cases where you have people running, you know, driving 100 miles an hour, making dangerous turns, engaging in similar type of conduct. All right. Thank you, counsel. McKeever v. Allison will be submitted.
judges: Whyte, Wardlaw, Berzon